UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
SONITO SHIPPING COMPANY LTD.,           :
                                        :     06 Civ. 15308 (CSH)
                    Plaintiff,          :
                                        :
         -against-                      :     MEMORANDUM OPINION
                                        :            AND ORDER
SUN UNITED MARITIME LTD.,               :
                                        :
                    Defendant.          :
------------------------------------------------------------ x

HAIGHT, Senior United States District Judge:

      Plaintiff, asserting a claim for relief within the admiralty and maritime jurisdiction under Rule 9(h), Fed. R. Civ. P., commenced this action in order to invoke the remedy of maritime attachment and garnishment afforded by Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

      On the basis of the complaint and accompanying affidavits, the Court issued an *ex parte* Order for Process of Maritime Attachment. Plaintiff thereafter restrained funds belonging to the defendant in the amount of $392,888.07.

      Defendant now moves pursuant to Supplemental Rule E(4)(f) for an order vacating the attachment. For the reasons that follow, the motion is granted.

## BACKGROUND

      The complaint alleges that on October 26, 2004, plaintiff Sonito Shipping Company Ltd. ("Sonito") as owner, and Sun United Maritime Ltd. ("Sun United") as charterer, entered into a maritime contract of charter party on the New York Produce Exchange form for the use and operation of Sonito's vessel, the M/V LAZOS. Compl. ¶ 4. During performance of the charter party and at the direction of Sun United as charterer, the LAZOS carried a cargo of long grain rice from

India to Nigeria. Upon discharge of the cargo at Port Harcourt, Nigeria, "it was discovered that some of the cargo was slack, torn, caked, lost overboard and otherwise not delivered." Compl. ¶ 6. As a result of this damage to and loss of their cargo, the cargo receivers have asserted a claim against Sonito in the amount of $260,000. Compl. ¶ 7. Sonito alleges that Sun United is liable to Sonito for that amount "under the terms and conditions of the October 26, 2004 charter party." *Id*. Sonito further alleges that Sun United is "in breach of its obligations under the terms of the subject charter by wrongfully refusing to pay the cargo receivers' claim." Compl. ¶ 9.

According to ¶ 14 of the Complaint, the amount of $392,888.07 attached by Sonito was comprised of the following: Sonito's "claim for damage to and loss of cargo of $260,000," ¶ 14(a); interest on that sum in the amount of $32,888.07, ¶ 14(b); and legal fees, arbitrator fees, and costs in an estimated amount of $100,000, which Sonito estimates will be recoverable under governing English law in connection with an arbitration in London, ¶ 14(c).

While not alleged in the complaint, it is common ground that the cargo receivers have commenced an arbitration in London against Sonito for the purpose of asserting their claim for the damage and loss suffered by the cargo. It is further agreed by the parties that no award has yet been made in that arbitration, and that Sonito has made no payment, by award, judgment, settlement, or otherwise, to the cargo receivers.

The relevant terms of the charter party are these:

Clause 60 provides in pertinent part:

> THIS CHARTER PARTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF THIS CHARTER PARTY SHALL BE REFERRED TO ARBITRATION IN LONDON . . .

Clause 8 provides in pertinent part:

> Charterers are to load, stow, and *in accordance with port/Shippers/Receivers requirements with regard to material required for the protection of the cargo, tally, discharge, lash, secure, unlash, unsecure* and trim the cargo at their expense under the supervision of the Captain . . .

(emphasis in original).

Clause 36 provides:

> CARGO CLAIMS TO BE SETTLED IN ACCORDANCE WITH THE INTER-CLUB NEW YORK PRODUCE EXCHANGE AGREEMENT, AS AMENDED MAY 1984, INCLUDING LATEST AMENDMENTS.

The "Inter-Club New York Produce Exchange Agreement" referenced in Clause 36 is commonly referred to as "the ICA," and I will do so in this Opinion. It is undisputed that the form of the ICA in effect at the times pertinent to this case is the 1996 version.

The ICA provides in ¶ 4:

> Apportionment under this Agreement shall only be applied to cargo claims where: . . . (c) the claim has been properly settled or compromised and paid.

Paragraph 7 of the ICA provides:

> The amount of any cargo claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charterparty seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charterparty.

Under ¶ 8 of the ICA, cargo claims are apportioned on the basis of 100% to be paid by the shipowner, or 100% by the charterer, or 50% by the shipowner and 50% by the charterer, depending upon the particular factors or events which caused or contributed to the cargo loss or damage.

On this motion to vacate Sonito's maritime attachment, Sun United argues principally that under English law the claim Sonito asserts for indemnity in respect of a cargo claim that Sonito has not yet paid is premature by reason of ¶ 4(c) of the ICA, and consequently cannot form the basis for an attachment under Supplemental Rule B.  Sonito argues principally that any damage to the cargo resulted from the fault of the stevedores at the discharge port, for which Sun United is responsible under Clause 8 of the charter party, and that under English law the ICA does not preclude Sonito's claim for indemnity based upon breach of contract, a claim which accrues on the date of the breach and consequently can form the basis of a Rule B attachment.   Both parties submit affidavits of English counsel in support of their respective contentions.

## DISCUSSION

In order to attach Sun United's property, Sonito invoked the Federal Rules of Civil Procedure.  Rule 9(h) provides that a pleading "setting forth a claim for relief within the admiralty and maritime jurisdiction" of the United States "may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of . . . the Supplemental Rules for Certain Admiralty and Maritime Claims."

Supplemental Rule A provides that the Supplemental Rules "apply to the procedure in admiralty and maritime claims within the meaning of Rule 9(h) with respect to the following remedies:  (1) maritime attachment and garnishment; . . . ."

Rule B sets forth the procedure to be followed in obtaining a maritime attachment or garnishment in aid of an in personam maritime claim.[1]  Rule B(1) provides in part:

---

[1] An in personam claim, of the sort asserted by Sonito against Sun United, may be contrasted with an in rem action to enforce a maritime lien.  In rem actions are governed by Supplemental Rule C.

4

> (a) If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.
>
> (b) The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Rule B(2) provides that following an attachment of a defendant's property, no default judgment may be entered in the action except upon proof that the complaint, summons, and process of attachment or garnishment have been served upon the defendant in the manner specified by Rule B(2), or that diligent efforts to give notice of the action to the defendant have been made.

Rule E(4)(f) provides in pertinent part: "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Rule E(4)(f) "is designed to satisfy the constitutional requirement of due process by guaranteeing to the [defendant] a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 272 (2d Cir. 2002) (quotation omitted). "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 n.5 (2d Cir. 2006). In the case at bar that burden falls upon plaintiff

Sonito, which procured the Rule B attachment of Sun United's funds.

In *Aqua Stoli*, the Second Circuit summarized the practice of maritime attachment under the Supplemental Rules:

> [I]n addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that (1) it has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E.

460 F.3d at 445 (footnote omitted).

The case at bar turns upon whether Sonito has satisfied the first requirement identified by *Aqua Stoli*, namely, whether the complaint pleads "a valid prima facie admiralty claim" against Sun United. Sonito's claim against Sun United is based upon an alleged breach by Sun United of the contract of charter party. It is common ground that a charter party is a maritime contract, so Sonito is asserting an "admiralty claim" against Sun United; but is it a *valid* "prima facie admiralty claim," as Rule B requires? This is a question of substantive law. The Supplemental Rules apply, as Rule A states, "to the *procedure* in admiralty and maritime claims." Neither Rule B nor any other of the Supplemental Rules create "a valid prima facie admiralty claim." Rather, the Supplemental Rules fashion procedures by which a valid maritime claim may form the basis for a writ of maritime attachment. The existence *vel non* of a valid maritime claim for purposes of a Rule B writ of attachment turns upon the applicable substantive law, in this case the law of contract.[2] And that

---

[2] The same principle applies to Supplemental Rule C's provisions in an in rem action for the arrest of a vessel or other property to enforce a maritime lien. The existence *vel non* of the maritime lien sought to be enforced is determined by the applicable substantive law, not by the

leads to a consideration of English law because, as noted *supra,* the parties agreed in the charter party that it "shall be governed by and construed in accordance with English law."

In addition to that choice-of-law provision, found in Clause 60 of the charter party, Clause 36 provides that "cargo claims" will be settled "in accordance with" the ICA. Thus, the ICA also forms a part of the contract between the parties.

It is necessary at this point to consider what the ICA is, where it came from, and what objectives it is intended to accomplish.

The "Clubs" embraced by the phrase "Inter-Club Agreement" are insurers of certain maritime risks referred to as "P&I Clubs." "P" stands for protection. "I" stands for indemnity. Protection and indemnity insurance covers ship owners and charterers against liabilities arising out of the operation of vessels for loss of life to any person, illness or injury to passengers and crew, damage to cargo while loading, carrying or unloading cargo, damage to piers and docks, removal of wreckage, the cost of major oil spills, and other misfortunes that may befall vessels and companies engaged in maritime commerce.

Unlike an insurance company, which writes a policy covering a particular insured, a P&I

---

procedures contained in Rule C. *See, e.g., Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir. 1992) ("Rule C(1)(a) is procedural and sets forth the means to file an *in rem* action to enforce a maritime lien. . . . However, maritime liens are not created by Rule C. Instead, they are an aspect of substantive, rather than procedural maritime law. The contract agreed to by the parties in the present case states that English law shall govern. . . . Therefore, English substantive maritime law governs this dispute."). The Eleventh Circuit, affirming the district court, held that the English law governing the ship repair contract in suit did not create a right "equivalent to an American maritime lien," and concluded: "Because a maritime lien is a prerequisite for an action *in rem* under Rule C(1)(a), the district court lacked jurisdiction over the Camilla." *Id.* at 617. Similarly in the case at bar, a presently existing valid maritime claim under substantive English law is a prerequisite for Sonito's action *in personam* with writ of attachment under Rule B.

Club is a mutual association made up of members. Thus, and by way of illustration, the full name of The London Club, an English P&I Club, is "The London Steam-ship Owners' Mutual Insurance Association Limited." Shipowners and charterers wishing to insure themselves against these maritime risks apply to become members of a P&I Club. The payments its members make to the Club are not called "premiums"; they are known as "calls." In keeping with the concept of a club, one may think of such payments as dues. The P&I Club pays covered claims out of revenues generated by the calls imposed upon the members (while endeavoring at all times to maintain sufficient financial reserves and reinsurance).

Claims by third parties for cargo damage or loss are among the more common claims presented to P&I Clubs. Where the vessel carrying the cargo is operating under a charter party, the cargo owner may assert a claim for damages against the shipowner, the charterer, or both. The shipowner may be a member of one P&I Club and the charterer a member of another. The apportionment of liability for cargo damage and loss among a shipowner and a charterer can be litigious, vexing, and expensive. To alleviate these problems, a number of P&I Clubs entered into the ICA. The Second Circuit acknowledged the existence and purpose of the Agreement in *Siderius, Inc. v. M/V Amilla*, 880 F.2d 662, 664 (2d Cir. 1989):

> In determining how the payment of these damages should be apportioned between defendants [shipowner and charterer], the court looked to the New York Produce Exchange Interclub Agreement (Interclub Agreement or Agreement), a well-known, long-established agreement specifically identified in the charter party as the document that would govern the settlement of any disputed cargo claims.

In *Siderius*, the cargo owner sued the shipowner for rust damage to a cargo of steel sheets. The shipowner filed a third-party complaint against the charterer. The charter party provided for the

apportionment of cargo claims under the ICA. After a bench trial, the district court applied the ICA, held that the cargo damage "should be apportioned 50% to the owner of the vessel and 50% to the charterer," and ordered the charterer to indemnify the shipowner for half of the damages awarded to the cargo owner against the shipowner. 880 F.2d at 664. The Second Circuit affirmed that judgment, observing that "[t]he parties' election to incorporate the Interclub Agreement is analogous to parties specifying what law or procedures will govern potential disputes," and concluded that "the 50/50 split between [shipowner] and [charterer] is the most equitable apportionment of liability on these facts and is also the result that adheres most closely to the wording of the Interclub Agreement that the parties agreed would govern." *Id*. at 666-67.

Further insight into the genesis and intended effect of the ICA may be gleaned from the opinion of the English Court of Appeal in *D/S A/S Idaho v. Peninsular & Oriental Steam Navigation Co. (The Strathnewton)*, [1983] 1 Lloyd's Rep. 219 (C.A. 1982). The charter party included a Clause Paramount incorporating the provisions of the United States Carriage of Goods by Sea Act of 1936 ("COGSA"), and also provided: "Cargo claims under this charter-party to be settled between Owners and Charterers under the Inter-Club New York Produce Exchange Agreement." Cargo owners asserted claims against the charterer. The charterer settled those claims and then, invoking the ICA, filed a claim in arbitration against the shipowner, claiming "to be entitled to an indemnity of 100% or 50%" of these payments. [1983] 1 Lloyd's Rep. at 219. The charterer did not assert its claim for indemnity within one year of the discharge of the goods, which inspired the shipowner to contend that the charterer's claim was time-barred under the one-year statute of limitations contained in COGSA, incorporated into the charter party by the Clause Paramount. The Commercial Court of the Queens Bench held that the charterer's claim for indemnity was time-barred. The Court of

Appeal reversed. In the words of the Court of Appeal, "[t]he issue, to put it broadly for the moment, is whether the settlement of cargo claims between owners and charterers pursuant to the Inter-Club Agreement is subject to the time bar in art. 3(6) of the Hague Rules." *Id*. at 221.[3] The resolution of that issue led the Court of Appeal to consider the "difficulties" inherent in determining liability for cargo damages as between shipowner and charter where (as in the case at bar) the charter party contained Clause 8 of the New York Produce Exchange form and a Clause Paramount incorporating the Hague Rules, and the salutary effect of incorporating the ICA as well. The Court of Appeal's judgment says:

> It is first necessary to say something about cl. 8, because the Inter-Club Agreement owes its existence to the difficulties to which this clause has given rise. . . . [T]he interaction of the Hague Rules with cl. 8 may cause additional problems of construction, and also in the allocation of responsibility for loss of or damage to cargo when there are disputes as to why, how, when or where such loss or damage occurred. . . . [T]he object of the Inter-Club Agreement was clearly to cut through all, or at any rate most, of these difficulties with a broad brush (and apologies for a mixed metaphor). . . . The scheme of the Inter-Club Agreement . . . cuts right across any allocation of functions and responsibilities based on the Hague Rules; indeed, the avoidance of such allocation is the very objective of the Inter-Club Agreement.

*Id*. at 222-23, 225. Given that genesis and those objectives, the judgment of Lord Justice Kerr for the Court of Appeal concluded that the one-year statute of limitations in the Hague Rules had no application to the charterer's claim for indemnity and apportionment under the ICA:

---

[3] The Court of Appeal's decision refers to the provisions of COGSA as "the Hague Rules." COGSA represents the enactment by Congress into domestic law of the principles governing the carriage of goods by sea contained in the Hague Rules, adopted as an international convention. "In 1936, the United States adhered to the Convention and Congress passed in implementation the Carriage of Goods by Sea Act, which with minor differences follows verbatim the Hague Rules." Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty*, 143-44 (2d ed. 1975) (footnotes omitted).

> The agreed apportionment has nothing to do with the Hague Rules, and is in fact designed to overcome many of the difficulties which would result from their application. It seems to me that in these circumstances art. III (6) [the one-year time bar provision] has no place in a settlement between owners and charterers under the Inter-Club Agreement. The *condition precedent* for the application of that agreement is that the bill of lading holders' [the cargo owners'] claims "shall have been properly settled or compromised." It contains no reference whatsoever to "the delivery of the goods or the date when the goods should have been delivered," which is the terminus a quo for the beginning of suit under art. III (6). One has only to read art. III (6) as a whole, let alone to read the Hague Rules as a whole, to see that the scheme of neither fits into the scheme of the Inter-Club Agreement in any way.

*Id*. at 225-26 (emphasis added).

Before returning to the case at bar, it is pertinent to stress that the inclusion of the ICA in a charter party is left entirely up to the parties to that contract. This is made apparent by an introductory paragraph to the ICA, which reads:

> The Clubs will recommend to their Members without qualification that their Members adopt this Agreement for the purpose of apportioning liability for claims in respect of cargo which arise under, out of or in connection with all charterparties on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such forms), whether or not this Agreement has been incorporated into such charterparties.

In other words, the P & I Clubs, which created the ICA, encourage their members to include the Agreement in their charter parties, but do not (and probably could not) seek to compel them to do so. And, in point of fact, when one studies the Rule B attachment cases based on indemnity claims recently coming before this Court, one notes that even where English law governs and arbitration will take place in London, sometimes the ICA is incorporated into the charter party and sometimes it is not.

In the case at bar, the validity of the Rule B attachment Sonito obtained depends upon whether, at the time Sonito filed its complaint, it had a valid maritime claim against Sun United which entitled Sonito to the attachment. For the reasons stated, that question is governed by the English law.

Sonito's complaint makes it clear that its claim is solely one for indemnity with respect to Sonito's liability to the cargo interests on a claim that those interests have asserted against Sonito. That claim will be decided by arbitration in London. It appears from the motion papers that Sonito is resisting the cargo interests' claim. It is common ground that the arbitration is just getting started, the arbitrators have not made any award, and Sonito has not made any payment to the cargo interests in respect of their claim. The question therefore becomes whether Sonito's contingent claim for indemnity has accrued so as to form a sufficient basis for a Rule B writ of attachment. Courts confronting this question ask whether the indemnity claim has "accrued," or whether it is "premature," or whether it is "ripe." In the context of maritime attachments, these words all describe the same issue.

In general, courts in this circuit have not been receptive to contingent indemnity claims as bases for maritime arrests for attachments. In *Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901 (2d Cir. 1965), after the cargo interests asserted a claim for damage, the charterers commenced an action for indemnity against the shipowner and seized the vessel. The district court dismissed the action on the ground that the action "based on this indemnity claim did not state any cause of action justiciable in admiralty but instead was entirely speculative and hypothetical." *Id.* at 903. On appeal, the Second Circuit defined the question as "whether Greenwich's libel stated a good 'cause of action' in admiralty against the Alexandra and Fidelity, thereby entitling it to have the U.S. Marshal

seize the Alexandra." *Id.* at 904. The court of appeals concluded that "the district court properly held that this claim was premature," no judgment having been entered against the charterer for the cargo damage and no suit having been instituted against it. *Id.* at 905. While the Second Circuit acknowledged that "some district judges sitting in admiralty have been willing under certain circumstances to ignore the prematurity of a claim, this does not mean that all doctrines of accrual have been abrogated in admiralty," and reasoned that "the factual pattern of the present case is quite unlike that in those few isolated cases where the district court chose to overrule the prematurity objection." *Id.* at 905-06 (citations omitted). *Greenwich Marine* relied upon American case law; the shipowner and charterer apparently had not agreed in their contract that any other law would govern.

More recently, a number of district judges of this Court have vacated maritime attachments based upon comparable claims for contingent indemnity. *See, e.g., J.K. Int'l, Pty., Ltd. v. Agriko S.A.S*, No. 06 Civ. 13259, 2007 WL 485435 (S.D.N.Y. Feb. 13, 2007) (Karas, *J.*), at *4, *5 ("Plaintiff's claims against defendant are therefore for indemnity only, and Plaintiff must show that its indemnity claim is ripe"; in absence of evidence that shipowner intended to press a demurrage claim against charterer, charterer's claim for contingent indemnity against cargo receivers "is simply too thin a reed to rest on when Plaintiff carries the burden of defending the Attachment") (citing American cases); *Bottiglieri di Navigazione SPA v. Tradeline LLC*, No. 06 Civ. 3705, 2007 WL 404657 (S.D.N.Y. Feb. 6, 2007) (Kaplan, *J.*), at *2 (where back-to-back charter parties required that contract disputes be arbitrated in London under English law, shipowner had settled cargo receivers' claim for damages, and shipowner had announced its intention to seek to recover that payment from the head charterer in arbitration, head charterer's claim for contingent indemnity against sub-

13

charterer could not sustain a maritime attachment of the sub-charterer's property; "[t]his claim for indemnity is not ripe under English law. Plaintiff thus has not established the 'valid prima facie admiralty claim' required under *Aqua Stoli*.").

The reported case most closely resembling this one is Judge Scheindlin's opinion in *T & O Shipping, Ltd. v. Lydia Mar Shipping Co.*, 415 F. Supp. 2d 310 (S.D.N.Y. 2006). A charterer asserted a claim against the shipowner for indemnity for potential third-party claims for damaged cargo resulting when the chartered vessel ran aground. The charterer obtained a writ of maritime attachment on the basis of that claim. Judge Scheindlin granted the shipowner's motion to vacate the attachment. As in the case at bar, the charter party in *T & O Shipping* provided that the shipowner and the charterer would apportion liability for cargo claims on the basis of the ICA. The question confronting Judge Scheindlin was whether, under the ICA protocol, the charterer's claim for indemnity was premature and hence could not support a writ of attachment. Addressing that question, Judge Scheindlin said:

> There are no English cases which deal precisely with the question of whether a cause of action based on the Inter-Club Agreement accrues before or after the cargo claims have been resolved. Not surprisingly, the English barristers retained by the parties, reach opposite conclusions on this question.
>
> T & O has not made a prima facie showing that it has a maritime claim against Lydia Mar for indemnity. Cargo claims have been filed against T & O by third parties, but they have yet to be resolved. If T & O had paid claims and was in the process of actually seeking indemnity from Lydia Mar, the need for security would be clear. While it seems likely that an indemnity claim cannot be brought before the underlying claim is "properly settled or compromised and paid," the issue whether the Charter Party *requires* an accrued cause of action before T & O may bring an indemnity claim remains in dispute. This is a substantive legal question which will be decided under English law in the arbitration and is not a question that this

14

> Court should or will resolve. Accordingly, the attachment should be vacated until that question is decided and/or the claims have clearly accrued.

415 F. Supp. 2d at 316 (footnotes omitted) (emphasis in original).

Procedurally, the case at bar mirrors *T&O*. The charter parties in both cases were governed by English law and incorporated the ICA. The claims for contingent indemnity upon which the Rule B attachments were issued are the same; it is of no moment that in *T&O* the charterer asserted the claim in respect of a cargo claim not yet paid, while in the instant case the shipowner asserts that claim against the charterer. The core question is the same: whether a cause of action for apportionment and indemnity based on the ICA accrues before or after the cargo claims have been resolved. English barristers retained by the parties gave conflicting opinions on that question in *T&O*; equally unsurprisingly, they do so in the case at bar. Indeed, one of the barristers is the same: Mr. Charles Priday submitted a declaration and a reply declaration on behalf of Sun United in this case, and also submitted a declaration to Judge Scheindlin in *T&O, see* 415 F. Supp. at 316 n.32.

In *T & O,* Judge Scheindlin was entirely correct in identifying the core question as being whether a cause of action for indemnity had accrued at the time of the Rule B attachment, and concluding that English substantive law governed that question. With respect, however, I choose not to follow her course of vacating the attachment while awaiting a resolution of that question by English arbitrators or courts. That may take a considerable amount of time.[4] If it is finally

---

[4] Judicial review of arbitration is more broadly available in England than in this country. That review may take place even during the course of the arbitration and before an award is made. Under the English practice, where the parties agree in their contract that disputes will be resolved by arbitration in London, and the arbitration hearings have commenced but before the entry of an award, the arbitrator may "state a consultative case" on a point of law for decision by a High Court judge, whose decision may then be subject to appeal. *The Strathnewton*, discussed in text, was such a case; *see* [1983] 1 Lloyd's Rep. at 221 ("This is an appeal with leave granted

15

determined by the English proceedings that the claim of the plaintiff in this Court had accrued and constituted a valid maritime claim at the time of the Rule B attachment, then the attachment should not have been vacated, and in the interim the defendant may have dissipated or hidden its assets, thereby unfairly depriving plaintiff of the security Rule B is intended to confer.  Consequently, I think it is incumbent upon this Court to determine whether Sonito has borne its burden of showing that at the time of the attachment it had a valid prima facie maritime claim against Sun United, even though that determination requires me to consider a substantive question governed by English law.

In his first declaration on behalf of Sun United in this case, Mr. Priday opines: "The preconditions set forth in clause (4) of the ICA must be satisfied before the cause of action for indemnity accrues.  If therefore Owners have not yet properly settled or compromised and paid the cargo claim, they have no accrued right to indemnify under the Inter-Club Agreement." Priday 1st Decl. ¶ 29(a).  Nigel Jacobs, Q.C., has submitted a declaration on behalf of Sonito in which he opines principally that "as a matter of English law and at the date of the Verified Complaint, the Owners had an extant cause of action against the Charterers for breach of Clause 8 provided that the cause of action for breach of Clause 8 was not itself extinguished by virtue of Clause 36 and the incorporation of the ICA," and goes on to answer that question by opining that while there was no case directly on point, "an English Court may be persuaded to conclude that the ICA is not 'paramount' to the exclusion of any Clause 8 rights." Jacobs Decl. ¶ 73(ii).  Alternatively, Mr. Jacobs contends that, even assuming the ICA has paramountcy over Clause 8, the ICA should be

---

by Mr. Justice Robert Goff from a judgment he delivered on Apr. 20, 1952, on a consultative case stated by Mr. Alan H. Kent [the sole arbitrator] for the opinion of the Court under § 21 (1) of the Arbitration Act, 1950.").  No such procedure exists under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

read as indemnifying against liability rather than against the discharge of that liability, so that a cause of action in favor of Sonito had accrued at the time of the attachment. Mr. Jacobs's reasoning does not persuade Mr. Priday on either point; he opines in his second declaration: "The cause of action for indemnity under the ICA does not accrue until the cargo claim has been properly settled and paid. The ICA code is intended to displace claims under clause 8 for indemnity against cargo claims. It has paramountcy, both by its terms and by the terms of clause 36 which mandates that cargo claims be dealt with in accordance with the ICA, not by some other basis of claim." Priday 2d Decl. ¶49 (a), (b).

The core question in this case, governed by English law, is whether at the time Sonito filed its complaint and obtained the writ of attachment it had a valid maritime claim against Sun United. On that question, I think that Sun United has the stronger case. While Mr. Priday says in his first declaration that none of the "reported English cases have directly confronted the issue as to when the cause of action under the ICA accrues," Priday 1st Decl. ¶ 17, a point with which Mr. Jacobs agrees, Mr. Priday cites the decisions of two South African courts which, interpreting the ICA, squarely hold that "the obligation to indemnify only arises once the underlying claims have been met." Priday 1st Decl. ¶ 17(a), (b). I accept Mr. Priday's submission that these cases, while not binding upon an English court, would be regarded as persuasive authority. Moreover, I interpret (with deference) the Court of Appeal's judgment in *The Strathnewton* to indicate rather clearly that the Court would not accept Mr. Jacobs's suggestion that a claim by a shipowner alleging breach by the charterer of Clause 8 of the charter party could be asserted, and would accrue, independently of the agreed-upon ICA protocol. In *The Strathnewton* the Court of Appeal stressed that the object of the ICA "was clearly to cut through" the difficulties created by Clause 8 and the Hague Rules in

17

respect of the fixing of liability for cargo damage as between shipowner and charterer, and added that the "condition precedent" for apportionment and indemnification under the ICA was that the cargo claims had been paid. "Condition precedent" is a term of art in the law; ordinarily, such a condition must be satisfied before an obligation arises or a cause of action accrues. This works no unfair hardship upon Sonito in this case. Sonito was not required to agree to the incorporation of the ICA in the charter party, but having done so is bound by it. For these reasons, I conclude that Sonito has not carried its burden of showing that at the time of the attachment it had a valid maritime claim against Sun United.

Finally, plaintiff requests that this Court exercise its equitable discretion to uphold the attachment even if the claim is unripe. Some earlier cases have suggested that district courts possess such discretion. *See, e.g., Patricia Hayes Assocs., Inc. v. Camell Laird Holdings U.K.*, 339 F.3d 76, 82-83 (2d Cir. 2003) ("a district court *may* in some circumstances disregard the prematurity of a plaintiff's claim as a matter of discretion") (emphasis in original); *Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965) (noting that "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge" and that "some district judges sitting in admiralty have been willing under certain circumstances to ignore the prematurity of a claim"). But it is unclear whether this discretion survived the Second Circuit's decision in *Aqua Stoli*, which directed that "a district court *must* vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B and E." 460 F.3d at 445 (emphasis added). In any event, such discretion—if it still exists at all—should only be exercised under compelling circumstances, which are not present in this case. *See Patricia Hayes Assocs., Inc.,* 339 F.3d at 82-83 (noting a case where "the district court declined

to dismiss a claim that was premature when filed but certain to mature shortly (*i.e.*, within a matter of hours)"); *Greenwich Marine, Inc.*, 339 F.2d at 905 ("[t]he prematurity objection has been ignored only in isolated situations under peculiar factual circumstances").

For the foregoing reasons, the writ of attachment is vacated and the complaint is dismissed. This vacatur and dismissal are without prejudice to the plaintiff filing a complaint and seeking an attachment at a later date, if subsequent developments make it clear that under English law a claim for indemnity has accrued.

It is SO ORDERED.

Dated:  New York, New York
        March 16, 2007

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE